We'll hear the first case on calendar, Trustees of Upstate New York Engineers vs. Ivey Asset. Good morning. Good morning, and may it please the court. My name is Louis Malone, and I'm here this morning on behalf of the trustees of the Upstate New York Engineers Pension Fund, seeking the reversal of the district court's determination to dismiss our first amended complaint on the grounds that we failed to state a cause of action under Federal Rule Civil Procedure 12B6, as well as that we lacked Article 3 standing to pursue our claim. We believe that under the appropriate standards for Article 3 standing as well as Rule 12B6, our complaint does state a cause of action, and it was error for the district court to have dismissed it. I would like to start by saying what this case is not about. This case is not about seeking any recovery from the Madoff estate. It is not about seeking to recoup losses in a manner that would or could negatively impact any other Madoff investor. Did you originally seek the $50 million? I'm sorry, say again please. Did you originally seek the $50 million that was in the account at some point? Didn't the trustees seek that amount? No, your honor. In this procedure? No, we did not. We did not seek that in our complaint. What we sought in our complaint is the lost opportunity cost from obtaining the balance of our account as of 1998. I see. That was 36,600 and change. That is correct, your honor. And this case. Now we understand who the parties are and we understand you're not trying to get any money out of Mr. Madoff, doesn't have any anyway. And the other people who got taken advantage of there. But let's turn to this case. Okay, very good. Thank you, your honor. What this case is about is seeking to hold ERISA fiduciaries liable for the breaches of fiduciary duty which have been alleged in our complaint. We allege in our complaint that in 1998, Ivy, who was an ERISA fiduciary to our fund, became aware and understood that the Madoff investment was no longer prudent. That Ivy decided not to share the- Not that it was a Ponzi scheme or a fraud. Correct, your honor. There is, in this record, it is quite clear that Ivy did not know that it was a Ponzi scheme or a fraud. Ivy remained invested in it to some degree anyway. Ivy remained invested in it until the year 2000. And your client was advised to thin out, not to rely as much on it. Our client was never told Ivy's concerns concerning Madoff. I didn't say that. I'm sorry. But your client was advised or Ivy on your client's behalf did reduce your dependency on that fund. We made withdrawals, your honor, throughout a period of time pursuant to a funding policy that we had adopted. When in 1998, Ivy informed us, actually in 1999, Ivy informed us that it would be appropriate to have up to 15% of our assets in one investment. As opposed to, what did you have in Madoff before? It was under 15%. And so what the trustees did is they adopted a policy. I interrupted Judge Poole. I'm sorry. Just let me confirm, you survived the clawback action, correct? Yes, we did, your honor. On the basis of statute of limitations. On the basis of statute of limitations, that is correct, your honor. The elephant in the room is that you made all that money. Yes, your honor, but under ERISA, the fact that we made money is irrelevant for purposes of determining whether or not there is loss. The absolute question is whether or not we could have made more money by removing the Madoff investment and putting it into a prudent alternative investment. If you had done that, then that's exactly the situation you said would not have existed. In this case, it's not about. If you had done that, then all the other people who invested with Madoff, they would have been damaged to the extent that you pulled out the 36 million, isn't that right? Yes, your honor, but under the case that we refer to as Blemis II in our briefing, this court determined that customers of Madoff, such as ourselves, had a contract with Madoff. And that they were able to enforce that contract and to create what this court called a enforceable securities entitlement. And furthermore, this court determined that the proceeds that would have come from that contract were settlement payments, as that term is defined in the bankruptcy code. The district court determined that we had no Article III standing. I'm sorry, I just asked, following up on Judge Pooler's question, if you had pulled out the $36 million, which is the basis of your claim. Yes, your honor. Then there would have been $36 million more stolen from the victims of Madoff, in a nutshell, correct? Yes, your honor, but we had a right to that money. We have a, we have- I'm not sure how you have a right to money that's just stolen from other people. Because in Blemis II, they said we have a contract, and we have a right to enforce our contract. We have a right to secure the securities obligation, and we have a right to obtain settlement payments. And as the court in Blemis II said, even if those settlement payments came from some other source. Even if they were stolen from somebody else. But isn't the standard about whether you had a loss, which is the basis of the Article III standing, isn't that found in Donovan versus Beerworth? Yes, your honor, which is the difference between what we could have made had we taken that money and what we did make. Did you allege what you could have made? We allege, your honor, that we would have made more. But did you have any evidence of that? Well, your honor, the evidence is that we would have taken $36 million in 1998 and invested it in a prudent alternative investment, which would seem to me self-evident that we would do better than $33 million, which we took over time. If you keep in mind that the fact is that we were investing from 1998 through whenever, when the market went up, down, and around. And at the pleading stage, your honor, I don't believe we have to state the exact amount of money that we would have made. We have to allege facts. You have to show a loss. Yes, your honor, and the loss is the difference. The difference between what we could have made and what we did make. And we allege that we could have made more in the market. That is the definition of loss under Beerworth. What you're calling your right to that money is really just the ability to hold on to stolen funds. I mean, you're completely innocent, but the right to hold on to stolen funds by virtue of the statute of limitations, which is really just a procedural device seeking a finality. Rather than as a matter of right. If we had, your honor, as I read Blemis II, and my time is up, if I may answer this question. As I read the Blemis II case, they say we have a contract. And that contract with Madoff, if we enforce that contract, creates a enforceable securities entitlement. That is a legally protected interest for purposes of article three standing. And the proceeds from that contract become settlement payments which we are allowed to hold on to. But then, you said earlier, I think in response to Judge Poole's question, that you prevailed in the clawback action by virtue of the statute of limitations. We did not have to pay that money back. That is correct, your honor. You prevailed in it by virtue of the statute of limitations. Yes. Otherwise, you would have had to pay it back. Why? Because you had no right to it, correct? Because we took out more than we did, than we put in under the bankruptcy code. But the whole idea of the clawback is you had no right to the money. Now, you prevailed in the clawback because of the statute of limitations. That really doesn't establish that you had a right to that money. Surely? Your honor, if we have a contract that we can enforce, that's a legally protected interest. I understand that's legally protected, but you're in a court of equity when it comes to this. I'm in the ERISA court, your honor, and ERISA is designed to protect participants and beneficiaries. That's correct. And it's a remedial statute and needs to be interpreted broadly. And the purpose of ERISA is to put us back into the position we would have been, but for the breach. But for the breach, we would have taken that money out. And if there was some consequence later down the road for taking that money out, that can't change the decision that was made. And you have to make the decision and you have to evaluate the decision on the basis of what was known in 1998. We know the returns from this investment were inflated because they were all phony, right? It went up inexorably, no matter what the market did. And I don't think you alleged what your alternative strategy would have produced. That's what the missing piece. You said what you earned, but you didn't say what you would have earned if you put it in some place that wasn't based on fraud. Well, we say, your honor, we would have put it into a prudent alternative investment. And what would that have produced in the period? We say it would have been greater than what we earned. And what we earned, your honor, is the money we took out of Madoff, plus whatever earnings we got on that money. because in some respects, we reinvested that money. In other respects, we used it to pay benefits. So our allegation is that if we had put this money in a prudent alternative investment. Do you have any, are you saying you don't have to at this stage of the pleading to give any idea what that investment would have? That's correct, your honor, because I think that's a matter for discovery. I think that's a matter that comes down. You have to accept as true our allegations. Right, but you have to show a loss to proceed, and you haven't met that test. Your honor, I believe we have, because we have alleged that we would have made more on our alternative prudent investment. I don't think we have to, at this stage of the proceeding, identify what that prudent alternative investment would have been. Is it true that you made about $33 million profit after December of 1998 and before the explosion of Madoff in 08? Yes, your honor. But you're saying you would have made more if you could have invested the $36 million in something else. That is correct, your honor. That's exactly what we're saying. That's, I understand. Thank you. You've reserved a two minute rebuttal. I have three, but I've used part of it. You've reserved three. Thank you. Good morning. Morning, your honors. May it please the court, my name is Louis Lyman. I represent IV Bank of New York and the other defendants in this case. Your honors, the underlying question in this case is whether the plaintiff appellant having profited handsomely off of fictitious profits from the fake Madoff statements are entitled to profit even more on the presumption that had they in 1998 sought to recover the fake stated amounts in the accounts, they would have been entitled to that amount of money. Where could they have found an investment like this, which always went up? Exactly right, your honor. Just to give you some of the numbers, the principal amount in 1998 that they had invested was $5.7 million. By seven years later, by 2005, they had withdrawn $38.7 million. You know, listening to the two of you is like looking through either end of the telescope. But if you take your adversary's argument and you view ERISA as something that ought to be applied certain amount of mechanical prediction, predictability, then you have the opportunity to withdraw $36 million in 1998. And if money doubles every seven years with prudent investments, it seems pretty clear that they could have made a lot more than that. And if we accept the fact that your client breached a fiduciary duty to tell them to run and don't stop, then they would have gotten more money and they would have been able to resist a clawback to some degree. And so they would have had more money for their members. Your honor, I think that's not right for two independent reasons. The first reason has to do with legal entitlement, and the other reason has to do with sort of a factual but-for-world. So let me talk about each of them separately. With respect to legal entitlement, my adversary likes to talk about BLMIS II. I like to talk about BLMIS I, your honor's opinion, and all of the other cases in which parties have sought fictitious profits from Ponzi schemes. And as your honor will recall, and as evident from the briefs, one of the main arguments made in BLMIS I was exactly the argument that they're making. There's a securities entitlement under the UCC. And the court said, importantly, that that UCC provision doesn't give one an entitlement to the proceeds from fake account statements that use the correct names of securities any more than it would give them the right to fall fictitious profits if they had just slightly altered the names. Madoff had slightly altered the names of the securities. Instead of IBM saying IBM series three. And the underlying reason why the court rejected that proposition, I submit, is the notion that a court will not make itself an accomplice to a fraud by essentially validating fictitious statements that are used as an instrument of the fraud. If your client pays out damages in this case, nobody gets defrauded. I mean, your client loses, and that's painful, but nobody gets defrauded. It is, Your Honor, correct that we are in some ways looking through two sides of the telescope. And our side of the telescope looks for what Dardaganis and Donovan says you do look at, which is what the but-for world would have been. What would have happened had we satisfied our fiduciary duties? We told them to keep it to 15%. They actually, in fact, reduced their investment over time to keep within 15%. They say we should have told them, take out that 36 million. Had we done that at the time, for two reasons, they would not have been entitled. Had we satisfied our duty, they would not have been entitled to the 36 million. First of all, the case law is clear that there's no entitlement to proceeds off of a Ponzi scheme. This is not a conventional case, the court described this as a conventional case. The point is that assuming your client breached fiduciary duty, which it seems to me you have to live with after it's pleaded, that did not deprive the plaintiffs of a right. A right to something that they had a right to have. That's correct, Your Honor, but I also want to mention the second point. Because the second point sort of departs from the language maybe specifically of right, but also talks about what they would have this court do. Now they say, well, we engineers didn't know that it was a Ponzi scheme. And they say, now they say, Ivy didn't know that it was a Ponzi scheme. In their first complaint, they said, we did know that it was a fictitious property. We're dealing with the second one. Well, I don't think you can create an ERISA claim that easily. For this reason, because the underlying facts are that it was a Ponzi scheme. And if they had brought a lawsuit back in 1998 to the fictitious profits and brought it against Madoff. Then unless the court was made a participant unwittingly, maybe to a fraud. Then they wouldn't have been entitled to those fictitious profits. Madoff certainly knew that he was executing a fraud. It doesn't really, in the end of the day, matter. We say they can't avoid it by the contrivance of just pleading out of it. But ultimately, it doesn't matter what they particularly knew. Because to hold that they could have gotten that money out means that, is to say, back in 1998, they would have, had they gone to court, been able to get that money. And if you say that, that means in turn that the court would have been made a unwitting dupe of a fraudulent scheme. Your argument would be a lot less appealing if the plaintiff fund had simply left the money in there and it accumulated to a hundred some odd million dollars when the whole thing went poof. And they became insolvent and the people lost their pensions. Yeah, Your Honor, that actually is the case of the people with whom we settled and who suffered a loss. There were people who suffered losses as a result of what they said was the Ivy breach of duty. And that loss would have been a loss of something that they had no right to anyway except to the extent of their investment. Correct, correct. The loss is the right to their principle. That is the loss. Now, I wonder if- On the other hand, your client is providing investment advice. People don't invest and pay fees to your client in order to get the money back that they put in. Well, Your Honor, they- Sometimes it happens, but they don't want it. And my client was not in business to provide bad advice. The consequence of providing bad advice is, as my client experienced, that the risk passed to it of a loss. Now, these folks didn't suffer a loss. But for people who did suffer a loss, my client suffered the consequence of it. I do want to just, if I can have 15 more seconds, I also want to- You changed it. It's now two minutes when the yellow light goes on. There are two points that I wanted to address that my adversary mentioned. First of all, he says, well, it's different because we're suing Ivy than if we were suing Madoff. And I think that's not true with respect to the measure of damages. It's certainly a different claim. It's a breach of fiduciary duty claim rather than a contract claim. And it would have been a breach of fiduciary duty claim. They could, in theory, still have an ERISA breach of fiduciary duty claim against Madoff. The statutory standard definition of loss is the same. And if they couldn't take the money out of the Madoff fund through an ERISA claim now, they certainly don't have any kind of right to do it through the vehicle of suing the deep pocket. The second thing I wanted to mention really goes to Judge Pooler's question. It just identifies the extraordinary nature of the claim here. The plaintiffs are not saying that, and I think they cannot say, that had they put their principle at the beginning in some alternative investment, they would have made more than what they made off of Madoff. It always went up. It always went up. It always went up. And not only that, but the money they took out was an extraordinary amount of money. What they are saying is that they're entitled both to the fictitious profits. That's the stated amount in the account that as of 1998. And they are also saying that they are entitled to what, had they gotten those fictitious profits, they could have made, had they put that money in another investment. They can't say that they just lost $36 million and that's what they're out of pocket because they got back $38 million. And there is no case that we're aware of that either says in a but for world that you get fictitious profits from a Ponzi scheme. There's also no case that we're aware of that says that you get as alternative investment profits not the money you could have made with your money, but the money that you could have made had you taken other people's money. And that's the thrust of our argument. Thank you. I see you have the red light. Thank you, Your Honor. Mr. Malone, we'll hear you on rebuttal. Thank you. In the ERISA context, you must look at what was known in 1998. Mr. Lyman's argument only makes sense if you take knowledge that is known today and apply it to decisions that were made in 1998, and you can't do that under ERISA. Well, since you're claiming you would have made more money one way than another in the intervening years, then you're also conducting an anti-historical argument. I'm conducting, with regard, Your Honor, to our prudent alternative investment, I'm doing the only thing I can do. I'm saying that we would have made more money had we gotten our hands on that money. But to determine whether or not we could have gotten that money in 1998, you have to look at what was known in 1998. You have to look at the knowledge that was known in 1998, and no one knew in 1998 that Madoff was running a Ponzi scheme. If we had sued to get our money, we probably would have won. Would have brought down the whole scheme earlier. I'm not sure that's true at all, Your Honor. There's absolutely no evidence in the record to suggest that. And other people made noise to get their money, and they got paid. Other- $30 million? People pulled $30 million out of his- They paid, people took millions of dollars out of there. Other investors took money. Indeed, some of Ivy's own clients, on Ivy's advice, subsequent to the purchase of Boney, by Boney of Ivy, took money out, because Ivy told them. Ivy told them what they say they, what we say they should have told us in 1998. And those people, I'm sure, got their money, invested it, and made whatever they made on their money. Other investors in 1998 did the same thing. You're not seeking to recoup from Ivy the fees that the fund paid to Ivy. We are with respect to the Madoff investment only. We paid a performance fee directed only at the Madoff investment. So clearly, if we had been out in 1998- Which didn't collect it. No, I'm seeking that, Your Honor, from all fiduciaries. I'm seeking that from Ivy. How much is that? It's a few million dollars. A million, I think it's two. Are you also seeking to charge Ivy with the fact that you raised the pension payments based on these for-profits? Because that seems to me a little beyond chutzpah. Well, I've never been quite accused of that, Your Honor, but I, the answer is yes. Stop me before I kill again? No, Your Honor. If a ERISA fiduciary gives us advice, and we rely on that advice, then the ERISA fiduciary is liable for the losses that that contains, that that involves. Ultimately, it was the union's decision to raise the pension rates because they were doing so well in this investment. Correct, Your Honor, and our point is if we had been told the truth, we wouldn't have raised the investments. We wouldn't have raised the pension rate. Yeah, I think that's a bridge too far. All right, well- Just personally. Thank you, Your Honor. To go back to the disgorgement, it looks to me like the disgorgement claim that you're pressing in your blue brief has to do with getting the disgorgement of what the principals of Ivy got when they sold the concern. That is correct, Your Honor. Bank of New York, but I don't see anything in this brief saying that you're pressing a claim for the couple million dollars that you paid, that your client paid for advice that was defective because it breached a fiduciary duty. Your Honor, I don't have my brief in front of me, but I know it is in there somewhere. But I would like to talk about that disgorgement claim, if I may, very quickly. Go ahead. ERISA provides that if a fiduciary breaches their fiduciary duty, and places planned assets at risk for their own benefit, and they profit from that experience. ERISA requires the breaching fiduciary to disgorge those profits. And how is it for their own benefit? I'm sorry, say again, please? How is it for their own benefit? Whose own benefit, Your Honor? When you said that if somebody breaches a fiduciary duty for their own benefit. Well, we know that Ivy, the reason why Ivy did not tell us what they should have told us in 1998 was so that they could retain their assets under management and the fees that those generated. What makes you think that if they gave you advice, I mean, what would support an inference that if your client was advised to go out of this investment, made off, and get in some other investment, General Motors, that they would not have continued to manage that money? I don't know, Your Honor, I don't know if that is, I don't know what the answer to that is. I don't know how much the trustees would have kept or not kept. What I do know is that the fees that I- But you're the one who has to say that they- Establish a profit. Yeah. And the profit, Your Honor, is the fees, the made off performance fees that we were paying, that we clearly would not have been paying had we been out of the made off investment. Thank you. Thank you both. We'll reserve decision.